ROY O. MARTIN, JR. and BARBARA M. MARTIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Martin v. Commissioner
Docket No. 12718-83.
United States Tax Court
T.C. Memo 1985-424; 1985 Tax Ct. Memo LEXIS 205; 50 T.C.M. (CCH) 768; T.C.M. (RIA) 85424; August 14, 1985. Scott P. Crampton and William B. Owens, for the petitioners. Robert M. Ratchford, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' *206 Federal gift taxes: Petitioner Roy O. Martin, Jr.
Calendar Period Ended
Deficiency
September 30, 1979
$155,217.15
June 30, 1980
$ 30,731.40
September 30, 1980
$ 24,452.35
Petitioner Barbara M. Martin
Calendar Period Ended
Deficiency
September 30, 1979
$155,217.15
June 30, 1980
$ 30,731.40
September 30, 1980
$ 24,452.35
The only issue for decision is the fair market value of shares of voting and nonvoting common stock of Arbor, Inc., a Closely held holding company, which were the subject of gifts made by petitioners on various dates during 1978, [1] 1979 and 1980. FINDINGS OF FACT Petitioners, Roy O. Martin, Jr. and Barbara M. Martin (hereinafter petitioner), are husband and wife; they resided in Alexandria, Louisiana, at the time the petition in this case was filed. 1. Arbor, Inc. and its Investments
During the periods here involved, petitioners owned voting preferred, nonvoting common, and voting *207 common stock in Arbor, Inc. (Arbor), a closely held corporation engaged in business in Louisiana. Arbor is classified as a personal holding company for Federal income tax purposes; its shares are not sold on any stock exchange. Throughout the periods at issue, Arbor had issued and outstanding shares in the following classes and amounts: Number of Shares
Class of Stock
Issued and Outstanding
Preferred, Voting
$1.00 par value
202.442
Common, Voting
$1.05 par value
168,140
Common, Non-Voting
$1.05 par value
163,140
Arbor's principal assets consisted of approximately 4,000 acres of timberland, the fair market value of which has been stipulated by the parties, for purposes of this proceeding only, at $3,275,056 for all gift dates here at issue, and minority investment interests in seven Martin family-held corporations. The following represents the outstanding shares of each of the seven corporations, and the stock ownership and percentage interest of Arbor: Outstanding
Arbor's
Arbor's Percentage
Corporation
Shares
Shares
Interest
Martin Home Centers,
Inc.
Common, Voting
957,000
126,061
13.17%
Roy O. Martin Lumber
Co., Inc.
Common, Voting
25,000
5,176
20.70%
Common, Non-Voting
15,000
2,059
13.73%
Preferred, Voting
29,750
2,114
7.11%
Martin Timber Co.,
Inc.
Common, Voting
12,500
2,500
20.00%
Common, Non-Voting
5,000
1,206
24.12%
Preferred, Voting
5,958
353
5.92%
Verneco, Inc.
Common, Voting
2,181
516
23.66%
Martin Development
Co., Inc.
Common, Voting
5,500
1,823
33.15%
Martin Park, Inc.
Common, Voting
1,780
328
18.43%
Teche Acres, Inc.
Common, Voting
400
60
15.00%
*208 These seven corporations are successors to the original Roy O. Martin Lumber Co., founded in 1923 by Roy O. Martin, Sr., father of petitioner Roy O. Martin, Jr. After the death of Roy O. Martin, Sr., the family business was split among his five children, who originally owned the stock of the seven corporations in roughly equal amounts. Several of the children transferred their interest in the companies to holding companies. Petitioners created Arbor for this purpose and it now owns the securities which were formerly held by the petitioners individually. During the years 1975 through 1979, Arbor realized net income and paid dividends on its preferred stock as follows: Year
Income
Dividends
1975
$33,868
1976
29,390
$30,366
1977
79,072
72,879
1978
120,227
103,245
1979
213,733
103,245
Arbor paid no dividends on its common stock during any of the years at issue. For the years 1975 through 1979, Arbor had earnings per common share as follows: Year
Earnings Per Share
1975
$ .10
1976
1977
.02
1978
.05
1979
.33
2. Description of the Seven Corporations
A. Martin Home Centers, Inc. (MHC)
MHC was incorporated *209 in June 1978. Pursuant to a plan of reorganization, it became the parent of six corporations that operate twelve retail lumber centers located in Louisiana, Arkansas, and Texas. Prior to the reorganization, the retail corporations were owned by Roy O. Martin Industries, Inc. (Industries). In addition to the retail lumber operations, Industries also owned and operated lumber mills, timber operations, and engaged in land development activities. As a result of the reorganization, MHC became the parent of the retail corporations, and the stock of Industries, with the mill operations, was transferred to Louisiana Pacific Corporation (LPC), an unrelated, publicly traded forest products corporation. Thus, upon the completion of the reorganization in July 1978, MHC carried on only the retail operations. In addition to its retail operations, as of December 31, 1979, MHC also owned 745,535 shares of LPC stock. MHC first acquired 709,629 shares of LPC stock in July 1978 in the reorganization, and an additional 35,906 shares through stock dividends received during 1978 and 1979. [2]
*210 When MHC acquired the LPC shares, they were not registered with the Securities & Exchange Commission (SEC), nor, under SEC rules, were they eligible to be registered until August 1981. Further, the shares were subject to certain contractual restrictions imposed by LPC which also curtailed the possibility of the shares being registered for at least 2 years from the date of their acquisition. These restrictions would have limited MHC's ability to dispose of the LPC stock during the periods here involved. For the years 1975 through 1979, MHC had earnings per share as follows: Year
Earnings Per Share
1975
$ .58
1976
.91
1977
1.45
1978
1.41
1979
2.15
For the years 1978 through 1980, MHC's adjusted operating profit (profit before depreciation and amortization, interest, State and Federal income taxes, as well as other nonoperating income and expense items) was as follows: Year
Adjusted Operating Profit
1978
$3,363,796
1979
2,033,506
1980
1,291,544
The total value of MHC, based on a 13-percent capitalization of adjusted operating profit, plus the value of the LPC stock, without regard to discounts for restrictions on the disposal *211 of LPC stock, lack of marketability, or Arbor's minority interest, as of the gift dates at issue was as follows: Date
Non-Discounted Total Value
1/25/78
$25,816,940
1/31/79
24,410,940
7/05/79
23,944,981
8/13/79
25,529,243
4/25/80
18,579,593
7/31/80
22,773,228
B. Roy O. Martin Lumber Co., Inc. (ROM)
ROM owns approximately 158,000 acres and leases an additional 40,000 acres of Louisiana timberlands. Included within these holdings are 50,000 acres of wetlands which require State and Federal approval for harvesting. For purposes of this proceeding only, the parties have stipulated that the fair market value of the ROM timberland for all gift dates is $118,800,000. In addition to its timber activities, ROM operates both a tie and a creosote plant. ROM receives further revenues from oil and gas lease royalty payments. ROM also owns 424,584 shares of MHC stock. ROM financial statements for the years 1977 through 1979 show the following breakdown of income from operations versus income from other sources: Income
Year
Classification
Amount
Percent
1977
Operating
$2,213,003
60.24
Other
1,460,648
39.76
Total
3,673.651
100.00
1978
Operating
2,981,801
53.61
Other
2,579,923
46.39
Total
5,561,724
100.00
1979
Operating
4,765,668
59.06
Other
3,304,059
40.94
Total
8,069,727
100.00
*212 For the years 1975 through 1979, ROM had earnings per share as follows: Year
Earnings Per Share
1975
$41.84
1976
53.82
1977
53.34
1978
80.91
1979
121.49
ROM's net asset value, without regard to discounts for lack of marketability or Arbor's minority interest, as of the gift dates at issue was as follows: Date
Non-Discounted Net Asset Value
1/25/78
$128,063,702
1/31/79
128,339,100
7/05/79
128,339,100
8/13/79
128,339,100
4/25/80
133,093,725
7/31/80
133,093,725
C.Martin Timber Company (MTC)
MTC owns approximately 60,000 acres of timberland and operates an outdated sawmill which is not competitive with newer mills. MTC's principal product is yellow pine lumber used in the construction industry. The parties have stipulated, for purposes of this proceeding only, that the fair market value of the MTC timberland for all gift dates is $48,000,000. In addition to its timber holdings, MTC owns 24,000 shares of MHC common stock. An analysis of MTC financial statements for the years 1977 through 1979 prepared by Zack Woodard, an officer and vice president of MTC, shows the following breakdown of operating versus other *213 income: Income
Year
Classification
Amount
Percent
1977
Operating
$691,387
47.64
Other
759,889
52.36
Total
1,451,276
100.00
1978
Operating
2,094,323
59.17
Other
1,445,246
40.83
Total
3,539,569
100.00
1979
Operating
2,458,073
63.52
Other
1,411,970
36.48
Total
3,870,043
100.00
For the years 1975 through 1979, MTC had earnings per share as follows: Year
Earnings Per Share
1975
$17.21
1976
52.20
1977
51.79
1978
132.40
1979
158.40
MTC's net asset value, without regard to discounts for lack of marketability or Arbor's minority interest, as of the gift dates at issue was as follows: Date
Non-Discounted Net Asset Value
1/25/78
$51,486,848
1/31/79
51,962,609
7/05/79
51,962,609
8/13/79
51,962,609
4/25/80
54,305,567
7/31/80
54,305,567
D. Verneco, Inc. (Verneco)
Verneco is a small timber company with approximately 7,000 acres of timberland, the fair market value of which the parties have stipulated, for purposes of this proceeding only, at $5,600,000 for all gift dates. In addition to its timber holdings, Verneco also owns 11,215 shares of MHC common stock, *214 1,339 shares of ROM preferred stock, and 1,800 shares of ROM voting common stock. A Verneco financial statement for the year January 1 through December 31, 1978 shows the following breakdown of operating versus other income: Income
Classification
Amount
Percent
Operating
$293,221
59.69
Other
198,052
40.31
Total
491,273
100.00
For the years 1975 through 1979, Verneco had earnings per share as follows: Year
Earnings Per Share
1975
$28.45
1976
38.93
1977
59.86
1978
147.19
1979
222.36
Verneco's net asset value, without regard to discounts for lack of marketability or Arbor's minority interest, as of the gift dates at issue, was as follows: Date
Non-Discounted Net Asset Value
1/25/78
$6,106,129
1/31/79
6,313,906
7/05/79
6,313,906
8/13/79
6,313,906
4/25/80
6,335,833
7/31/80
6,335,833
E. Martin Development Company (MDC)
MDC is a timber company which owns approximately 23,000 acres of timberland. The parties have stipulated that the value of the timberland, for purposes of this proceeding only, is $18,400,000 for all gift dates. In addition to its timber activities, MDC is also engaged *215 in the construction and sale of homes in small subdivisions in the Louisiana area. MDC also owns 12,000 shares of MHC common stock. For the years 1975 through 1979, MDC had earnings per share as follows: Year
Earnings Per Share
1975
$36.28
1976
44.91
1977
19.87
1978
39.72
1979
75.15
MDC's net asset value, without regard to discounts for lack of marketability or Arbor's minority interest, as of the gift dates at issue, was as follows: Date
Non-Discounted Net Asset Value
1/25/78
$19,169,830
1/31/79
19,625,950
7/05/79
19,625,950
8/13/79
19,625,950
4/25/80
19,838,881
7/31/80
19,838,881
F. Martin Park, Inc. (Martin Park)
Martin Park is a small land development company which sells lots in the Alexandria, Louisiana, area. Martin Park's book value as of the gift dates at issue was as follows: Date
Book Value
1/25/78
$513,510
1/31/79
511,715
7/05/79
511,715
8/13/79
511,715
4/25/80
556,884
7/31/80
556,884
G. Teche Acres, Inc. (Teche)
Teche, like Martin Park, is a small land development company principally involved in the sale of subdivision lots. Teche's book value as of the *216 gift dates at issue was as follows: Date
Book Value
1/25/78
$363,565
1/31/79
444,952
7/05/79
444,952
8/13/79
444,952
4/25/80
598,801
7/31/80
598,801
It is not anticipated that any of the seven Martin family corporations described above will be sold or liquidated within the foreseeable future; there is no assurance whatsoever that the underlying Martin company assets will be liquidated, or that the shares in those companies will be liquidated during this century. The controlling managements of the Martin interests have demonstrated a policy of adding to net timber holdings and, above all, maintaining the holdings in one tightly controlled family group. 3. The Gifts of Arbor Stock
Petitioners made gifts of shares of stock in Arbor on the dates and in the amounts as follows: Shares of
Shares of
Shares of
Voting
Non-Voting
Voting
Date of
Preferred
Common
Common
Donor
Gift
Stock
Stock
Stock
Roy O. Martin, Jr. [1]
1/25/78
None
3,510  1,710
Roy O. Martin, Jr. [1]
1/31/79
None
3,510  1,710
Roy O. Martin, Jr. [1]
7/05/79
470
None
None
Roy O. Martin, Jr. [1]
8/13/79
10,500
1,000  10,000
Roy O. Martin, Jr.
4/25/80
None
2,457  570
Barbara Martin
4/25/80
None
2,457  570
Roy O. Martin, Jr.
7/31/80
500
592.5
509
Barbara Martin
7/31/80
500
592.5
509
*217 The stock transferred by petitioners represented approximately 9 percent of Arbor's outstanding shares and represented minority interests in each class of Arbor stock. The gifted shares were distributed among 10 beneficiaries. Each type of stock is subject to a 1973 restrictive agreement under which the shares must be offered to other stockholders or to the corporation itself before they may be sold to outsiders. Petitioners filed Forms 709, United States Quarterly Gift Tax Returns for the calendar quarters ended December 31, 1978, September 30, 1979, June 30, 1980, and September 30, 1980. They reported the per-share values of the gifted Arbor stock as of the respective gift dates as follows: Reported Per-Share Values of Arbor Stock
Date of Gift
Non-Voting Common
Voting Common
Preferred
1/25/78
$8.67
$10.70
1/31/79
8.66
10.85
7/05/79
$12.84
8/13/79
8.66
10.85
12.84
4/25/80
8.55
10.70
7/31/80
8.55
10.70
12.84
In the notices of deficiency sent to petitioners, respondent determined the *218 following per-share values of the gifted Arbor stock: Per-Share Values of Arbor Stock
Period Ended
Non-Voting Common
Voting Common
Preferred
December 31, 1979
$34.50
$36.50
$36.50
September 30, 1979
37.50
39.50
39.50
June 30, 1980
40.00
42.00
42.00
September 30, 1980
40.00
42.00
42.00
The parties have agreed that as of all gift dates before us, the per-share fair market value of Arbor preferred stock was $5. The only remaining issue for decision is a determination of the fair market value of Arbor voting and nonvoting common stock for the six gift dates at issue. ULTIMATE FINDINGS OF FACT 1. The following table sets forth in round figures the approximate value of Arbor's investment interests in the seven corporations on the gift dates at issue: 1/25/78
1/31/79
7/5/79
MHC
Common
$1,020,000
$ 964,000
$ 947,000
ROM
Common
Voting
3,442,000
3,494,000
3,494,000
Common
Nonvoting
1,369,000
1,390,000
1,390,000
Preferred
82,000
72,000
70,000
MTC
Common
Voting
1,558,000
1,600,000
1,600,000
Common
Nonvoting
751,000
772,000
772,000
Preferred
14,000
12,000
12,000
Verneco
Common
310,000
329,000
329,000
MDC
Common
1,305,000
1,340,000
1,340,000
Martin
Park
Common
29,000
28,000
28,000
Teche
Common
16,000
20,000
20,000
Total
$9,896,000
$10,021,000
$10,002,000
*219 8/13/79
4/25/80
7/31/80
MHC
Common
$ 1,008,000
$ 734,000
$ 900,000
ROM
Common
Voting
3,494,000
3,623,000
3,618,000
Common
Nonvoting
1,390,000
1,441,000
1,439,000
Preferred
70,000
60,000
61,000
MTC
Common
Voting
1,600,000
1,668,000
1,668,000
Common
Nonvoting
772,000
804,000
804,000
Preferred
12,000
10,000
10,000
Verneco
Common
329,000
330,000
330,000
MDC
Common
1,340,000
1,354,000
1,354,000
Martin
Park
Common
28,000
31,000
31,000
Teche
Common
20,000
27,000
27,000
Total
$10,063,000
$10,082,000
$10,242,000
2. The following table shows in round figures Arbor's approximate common stock equity value after adjustments for the value of Arbor's timberland, current assets, loans to stockholders, liabilities, and the elimination of preferred stock equity: Date
Common Stock Equity Value
1/25/78
$11,734,000
1/31/79
$11,870,000
7/ 5/79
$11,851,000
8/13/79
$11,912,000
4/25/80
$12,037,000
7/31/80
$12,197,000
3. The following were the per-share fair market values of Arbor voting and nonvoting common stock on the applicable gift dates: Fair Market Value of Arbor Stock
Date
Voting Common
Nonvoting Common
1/25/78
25.25
25.25
1/31/79
25.65
25.65
7/ 5/79
25.60
25.60
8/13/79
25.75
25.75
4/25/80
26.00
26.00
7/31/80
26.35
26.35
*220 OPINION 1. General Principles
Section 2512(a), [3] Internal Revenue Code of 1954, provides that if a gift of property is made, the value of the property at the date of the gift shall be considered the amount of the gift. The instant controversy centers on the widely disparate positions taken by the parties with respect to the value, as of certain dates in 1978, 1979, and 1980, of gifted shares of voting and nonvoting common stock which represent a minority interest in Arbor, a closely held holding company whose shares are not publicly traded. We are thus called upon to determine the value of the Arbor stock as of the gift dates at issue. Fair market value, for purposes of the gift tax, is defined by the well-known formula as that price at which the subject property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts. Sec. 25.2512-1, Gift Tax Regs. In valuing shares of stock which, as here, *221 are not publicly traded, and for which neither actual sale prices nor bona fide bid and asked prices are available, section 25.2512-2(f), Gift Tax Regs., provides that the fair market value of such stock is to be determined by taking into consideration the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors including-- the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. * * * The host of factors listed above cannot, however, be applied with mathematical precision; each case necessarily turns on its own particular facts. Estate of Andrews v. Commissioner,79 T.C. 938, 940-941 (1982). [4] In the final analysis, a valuation question such as the one before us involves a "plaguingly elusive question of fact * * * which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like *222 pronouncement." Messing v. Commissioner,48 T.C. 502, 508, 512 (1967). In arriving at their respective positions concerning the value of the Arbor stock at issue, both parties consulted experts whose written opinions and testimony they presented at trial. The following is a description of the approaches to valuation taken by each expert and a statement of the conclusions reached by each. 2.Petitioners' Valuations
Petitioners' first expert, Jack Vaughn (Vaughn), a partner with the public accounting firm of Deloitte Haskins & Sells, is both an attorney and a certified public accountant with some 15 years experience in taxation and valuation matters. Vaughn concluded that because Arbor is essentially a holding company which holds timberland, the value of which had already been stipulated by the parties, and minority interests in seven closely held corporations, it would first be necessary to value the seven *223 underlying family corporations in order to ascertain the fair market value of the Arbor stock. Vaughn determined that five of the seven corporations, i.e., MHC, ROM, Verneco, MTC and MDC, were operating companies. For each of these corporations, Vaughn determined a 5-year weighted average of earnings per share, capitalizing it by a price/earnings multiple of 5. [5] He then determined the net asset value per share of each of the five corporations, reducing the value of any assets with unrealized appreciation, in particular the timberlands and stock held by each, by 28 percent. This percentage represents the Federal and State income taxes and other costs which would have to be paid if the assets were liquidated. *224 For MHC, in addition to the 28 percent liquidation reduction, Vaughn also reduced the value of MHC's LPC stock by 33-1/3 percent to account for its lack of marketability due to the restrictions on transfer placed on it by the SEC and by private agreement. It was Vaughn's opinion that MHC is an operating company, and as such its potential earnings are important in determining its value, because MHC also holds "significant investment assets" in the form of its LPC stock, MHC's earnings and net asset value deserve equal consideration in arriving at the value of MHC's shares. Thus, Vaughn arrived at a final per-share value for MHC by assigning equal weight to earnings and net asset value, and applying a 50-percent discount to account for the lack of marketability inherent in shares of a closely held corporation, and the fact that Arbor's interest in MHC was only a minority one. Vaughn arrived at a final per-share value for the common stock of ROM, MTC, Verneco, and MDC, all designated by Vaughn as operating corporations whose earnings, in Vaughn's opinion, would be "the most important valuation factor," by assigning a weight of 3 to earnings and a weight of 1 to net assets. Once *225 again, he applied a 50-percent discount to reflect the shares' lack of marketability and the fact that Arbor held only a minority interest in each of the corporations. [6]
As for Martin Park and Teche, Vaughn determined that because land holdings are the primary assets of both corporations, the most appropriate indication of value would be the book value of their assets. Accordingly, in valuing these two corporations, Vaughn computed the per-share book value of both Martin Park and Teche and again applied a 50 percent discount for lack of marketability and Arbor's minority interest. Having determined the per-share values for each of the 7 underlying corporations, Vaughn then valued Arbor using the same basic approach used for MHC, ROM, MTC, Verneco, and MDC. He determined a 5-year weighted average of Arbor's earnings per common share, capitalizing it by a price/earnings multiple *226 of 5. He then determined Arbor's net asset value per common share, reducing the value of the timberlands and Arbor's investment interest in the 7 underlying corporations by 28 percent to account for costs of liquidation, and further reducing the net asset value by the $12.84 per share redemption price of the preferred stock under the restrictive agreement. [7] Vaughn arrived at a final per-share value for Arbor by assigning a weight of 1 to earnings and a weight of 2 to net asset value and again applying a 50-percent discount to adjust for the lack of marketability of Arbor shares and the fact that the gifted Arbor shares represented only minority interests in Arbor, affording the donees no control. Vaughn determined that because the gifted shares of Arbor stock represented minority interests in all classes of stock, there would be no practical distinction between the voting and nonvoting common shares. Thus, he treated both the voting and nonvoting shares as having equal value. Vaughn determined that, as of December 31, 1979, the fair market value of Arbor's investment *227 interests in the 7 underlying corporations was $5,442,468, and that Arbor's net asset value was $7,500,214. [8]
In Vaughn's judgment, the fair market value of Arbor's common stock was, as of the dates and in the amounts, respectively, as follows: Fair Market Value of Arbor Stock
Date
Voting Common
Nonvoting Common
1/25/78
$3.68
$3.68
8/13/79
4.27
4.27
4/25/80
5.02
5.02
7/31/80
5.02
5.02
Petitioners' *228 second expert, Graham Humes (Humes), an investment banker with 20 years experience in providing valuation services, is a senior vice-president of the Mellon Bank, Philadelphia, Pennsylvania. As director of the bank's Corporate Finance Group, Humes participates in merger and acquisition negotiations, and has, for many years, assisted clients in disposing of closely held stock. When petitioners consulted Humes for his opinion concerning the value of the Arbor stock, they asked him to approach his valuation as though the Arbor stock had come into the hands of a judgment creditor who has asked Humes to help him dispose of the stock. In preparing his valuation, Humes relied on the financial information contained on a "condensed balance sheet at December 31, 1978, 1979, and 1980, prepared by JD," furnished to him by one of petitioners' attorneys. Although Humes refers in his report to specific financial information from this condensed balance sheet, the balance sheet itself is not reproduced as a part of his report, nor is it contained anywhere in the record. Using the information concerning Arbor's asset value as shown on the condensed balance sheet, Humes discounted the value of *229 Arbor's interest in the seven underlying corporations by 75 percent to account for the illiquidity of both the assets and shares of the corporations. He then reduced Arbor's asset value by the stipulated $5 per-share value of the preferred stock. Humes arrived at a final per-share value for the Arbor stock by further reducing Arbor's net asset value by an additional 20 percent to reflect the fact that the gifted shares do not afford the donees any power "to manage, liquidate, or reorganize Arbor." Humes determined that as of December 31, 1979, the fair market value of Arbor's investment interest in the 7 underlying corporations, after the 75-percent discount, was $7,016,151 and that Arbor's net asset value, before reductions for the preferred shares and the 20-percent discount, was $8,951,146. [9]Humes also determined, based on a capitalization of Arbor's dividends received at an 8 percent rate and an analysis of dividend yields of comparable publicly traded corporations, that the value of Arbor's investments in the underlying corporations would have ranged from $3,150,945 to $4,345,333 during 1978 through 1980. *230 In Humes' judgment, the fair market value of a minority interest in Arbor for all gift dates at issue would not exceed $19.17. Valuation of Arbor based on income expectations alone would be far less. In his testimony at trial, Humes stated that it would be extremely difficult to find a buyer for Arbor stock at the $19.17 per-share price. 3. Respondent's Valuation
Respondent's expert was Glenn Desmond (Desmond), an owner of the appraisal firm, Desmond and Marcello, which specializes in business valuations. Desmond has been a business appraiser for approximately 30 years. Like Vaughn and Humes, Desmond determined that before he could value the Arbor shares, it would first be necessary to value Arbor's interest in the seven underlying family corporations. Desmond's approach to the valuation of the seven corporations, however, produced results far different from either Vaughn's or Humes'. Desmond determined that MHC was an operating company and should be valued by capitalizing its adjusted operating profit. [10] Thus, Desmond applied a capitalization factor of 13 percent to MHC's adjusted operating profit for each of the gift dates at issue. [11] He also added the full *231 value of MHC's LPC shares, determines with reference to the quoted market price for the LPC stock on each of the gift dates. To the total value, Desmond applied a 35-percent discount to adjust for Arbor's minority interest in MHC and an additional discount of between 21 and 35 percent for each gift date to reflect the lack of marketability of MHC shares. *232 With respect to ROM, MTC, Verneco, and MDC, Desmond determined, based on an analysis of each company's operating versus nonoperating income, that because their earnings from operations were insignificant in comparison to their substantial net asset values, due in large part to the value of their timber holdings, each of these corporations should be considered investment companies rather than operating companies. As investment companies, Desmond determined that they should be valued with consideration given only to their net asset values. [12] To the net asset values of each of these four corporations, Desmond applied, in his valuation report, a 35-percent discount to reflect Arbor's minority interest in each. [13] At trial, Desmond conceded that an additional discount of 35 percent should be applied to the timber holdings of each of the four corporations to account for the lack of marketability of the shares. [14]
*233 Desmond valued Martin Park and Teche at book value, as did Vaughn. Rather than apply a 50-percent discount to each as did Vaughn, however, Desmond applied a 70-percent discount, 35 percent for Arbor's minority interest and an additional 35-percent discount to account for the lack of marketability of Martin Park and Teche shares. Having determined the value of Arbor's interest in the underlying corporations, Desmond valued Arbor based only on its net asset value (after subtracting the value of Arbor's preferred shares) with no consideration given to its earnings, in view of his conclusion that Arbor, as a holding company, should be valued as an investment company. Desmond, unlike Vaughn and Humes, applied no further "second stage" discounts for minority interest or lack of marketability at the Arbor level, because it was his opinion that any reduction in value of the Arbor shares due to minority interests or lack of marketability had already been recognized and accounted for through the 70-percent discounts used at the underlying corporation level. Based on Desmond's report, adjusted to conform with his trial testimony concerning the additional 35 percent marketability discount *234 for ROM, MTC, Verneco, and MDC, the fair market value of Arbor's investment interests in the seven underlying corporations and Arbor's net asset value would be approximately as follows: Fair Market Value
Date
Arbor Investments
Arbor Net Asset Value
1/25/78
$13,442,433
$16,292,371
1/31/79
$13,534,099
$16,395,420
7/ 5/79
$13,745,531
$16,606,852
8/13/79
$13,822,428
$16,685,170
4/25/80
$14,107,668
$17,074,548
7/31/80
$14,353,433
$17,320,313
On the basis of Desmond's report and his testimony at trial, respondent contends that the fair market values of the gifted Arbor stock, as of the gift dates at issue were as follows: Fair Market Value of Arbor Stock
Date
Voting Common
Nonvoting Common
1/25/78
$45.13
$45.13
1/31/79
$45.79
$45.79
7/ 5/79
$46.56
$46.46
8/13/79
$46.74
$46.74
4/25/80
$48.70
$48.70
7/31/80
$49.25
$49.25
4. Analysis of Reports
We have carefully considered the reports and testimony of all three experts. Although we have found the information provided by the experts enlightening and helpful, we think there are certain weaknesses in the respective valuation approaches taken *235 by each of them which convince us that none of their opinions should be adopted in determining the value of the Arbor stock. The major areas of disagreement between the parties which have caused the disparity in the values advocated by each [15] are: (1) the methods used to value four of the seven underlying family corporations; and (2) the proper discounts to be applied. We shall discuss our conclusions with respect to each in turn. A. Valuation of ROM, MTC, Verneco, and MDC
Both Vaughn and Desmond agreed that MHC, a retail corporation, should be valued as an operating company. Thus, in valuing MHC, each focused first on determining its future profit or earnings potential by capitalizing profits or earnings and then giving due consideration to the value of its LPC stock. [16] Similarly, both Vaughn and Desmond agree that Martin Park and Teche, both of which hold land for sale, are more *236 properly characterized as investment type companies. Thus, both considered the book value of their assets as the most appropriate measure of this value. With respect to ROM, MTC, Verneco, and MDC, however, there is no such agreement. Vaughn concluded, thus petitioners contend, that *237 these four corporations, all of which own valuable timberland and engage in the business of cutting and selling timber, are operating companies and greater weight should be accorded their earnings rather than their net asset values. Consequently, Vaughn capitalized the earnings of each of the four corporations and weighted earnings at three times the net asset values of each in arriving at his values. Desmond, on the other hand, determined, and respondent contends, that the earnings of each of the four corporations are inconsequential when viewed in light of the value of the timberlands held by each corporation. Because of their vast timber holdings, he concluded that it is most appropriate to value them as investment companies. Thus, Desmond valued each of the four corporations solely with reference to net asset value; he gave no consideration whatsoever to earnings. It is true that, in general, when valuing an operating company which sells goods or services, primary consideration is given to earnings, and when valuing a company which merely holds investments, primary consideration is given to asset values, see e.g., Levenson's Estate v. Commissioner,282 F.2d 581, 586 (3d Cir. 1960). *238 [17] It seems clear to us, however, that these four corporations are not easily characterized as either solely operating or solely investment companies and we decline to characterize them so. See Estate of Andrews v. Commissioner,79 T.C. 938, 945 (1982) and cases cited. Because the parties have categorized them as one or the other, however, we think the values arrived at by both parties are distorted. By insisting that they are operating companies and placing major emphasis on earnings, petitioner values them too low; by insisting that they are investment companies and considering only net asset values, respondent values them too high. *239 True, the four corporations own timberland of substantial value. It is also true, however, that each of the four corporations engages in and earns income from the cutting and sale of timber. Thus, in order to determine their value, we think more realistic consideration must be given to both their earnings and net asset values. Certainly, due recognition, from the hypothetical seller's point of view, must be accorded to the substantial value of the timberland held by each; so too, however, must it be recognized that their earnings would be important to the hypothetical buyer who, in this case, as a minority shareholder, would have no control over the liquidation of his investment and, indeed, might not even be able to hope for liquidation of his investment in this century. We find apropos the following statement from Estate of Heckscher v. Commissioner,63 T.C. 485, 493 (1975): To make a sale of this stock feasible the potential buyer would have to forego some current return on his investment in exchange for an interest in a net worth much more valuable than the price he pays for the stock, and the seller would have to be willing to part with an equity interest *240 in the company for much less than its indicated value in return for something that would produce a greater yield on his investment. * * * None of the three experts gave sufficient consideration to both the earnings and asset values of ROM, MTC, Verneco, and MDC, and as a consequence, the values arrived at by each and advocated by the parties are not properly reflective of actual fair market value. Thus, we have arrived at the values of the four corporations, set forth in our ultimate findings, by giving what is, in our judgment, appropriate weight to both earnings and assets. B. Discounts
Both parties agree that discounts are appropriate in this case to reflect the fact that the gifted Arbor shares at issue represent only minority interests in a closely held corporation which, in turn, owns minority interests in seven other closely held corporations. They disagree, however, on both the size of the discounts to be applied, and whether or not discounts should be applied only at the level of the seven underlying corporations, or at the Arbor level as well. As discussed above, Vaughn, petitioners' expert, applied a 50-percent marketability/minority discount at each level *241 plus a 28-percent discount to reflect potential liquidation costs. Desmond, respondent's expert, allowed no discount at the Arbor level but applied generally a 70-percent marketability/minority discount at the level of the underlying corporations. [18]
In arriving at the values set forth in our ultimate findings, we have been guided by, but do not find controlling, the approaches of any of the experts as to discounts. First, we reject petitioners' argument that the value of all assets with unrealized appreciation should be discounted to reflect liquidation costs. Petitioners presented no evidence which would suggest that liquidation of the assets of the seven corporations, of the corporations themselves, or of Arbor was imminent, planned, or even likely at any time in the near future. Indeed, on brief, petitioners requested the following finding of fact: It is not anticipated that any of the operating companies will be sold or liquidated within the foreseeable future. * * * With respect to discounts for liquidation costs, this Court stated the following *242 in Estate of Andrews v. Commissioner,79 T.C. 938, 942 (1982): Both parties have agreed here that there was no reasonable prospect of liquidation and the evidence clearly supports this finding. When liquidation is only speculative, the valuation of assets should not take these costs into account because it is unlikely that they will ever be incurred. * * * [Citations omitted.] See also Estate of Piper v. Commissioner,72 T.C. 1062, 1087 (1979). [19] In light of petitioners' admission and this Court's oft-stated position, we conclude that a 28-percent liquidation discount should not be allowed for any of the entities.
Likewise, we reject petitioners' contention that because the gifted shares represent only minority interests in Arbor, a closely held corporation, "second stage" discounts *243 of 50 percent for lack of marketability and minority interest are applicable at the Arbor level in addition to the 50-percent discounts applied by petitioners to the shares of the underlying corporations. Upon careful examination of the minority interests in Arbor transferred by petitioners, we conclude that the second stage 50-percent discounts are mostly duplicative of the 50-percent discounts applied at the level of the underlying corporations and, therefore, they unreasonably reduce the value of the Arbor shares. Arbor's investment interests in the seven underlying corporations, which represent minority interests in each of the corporations, comprise approximately 75 percent of Arbor's total assets. Petitioner recognizes Arbor's minority interest in each of the corporations, and the lack of marketability of the shares of each, by applying a 50-percent discount at the level of the underlying corporations. Even had petitioners transferred a majority interest in Arbor, the holder of a majority interest would still be unable to exercise control over the seven underlying corporations. In addition, the lack of marketability of the Arbor shares depends largely on the lack of marketability *244 of the shares of the underlying corporations. Thus, insofar as the gifted Arbor shares represent an interest in the seven Martin family corporations, lack of control over the family corporations and the lack of marketability of the shares of such corporations is more appropriately addressed at the level of the underlying corporations. We think, therefore, that respondent's application of a 70-percent discount at the level of the underlying corporations is a sufficient marketability/minority discount. We do think, however, that a small second stage discount of approximately 5 percent is appropriate at the Arbor level to reflect the transferred indirect minority interest in Arbor's timberland, the value of which comprises less than one-quarter of Arbor's total assets. Any transferred interest in Arbor's timberland obviously could not have been addressed at the level of the underlying corporations inasmuch as it is held by Arbor, not the corporations. By applying discounts only at the level of the underlying corporations, respondent ignores the fact that the interest in Arbor's stock transferred by petitioners affords no control over the management or liquidation of Arbor's timberland. *245 Thus, we agree with petitioners, at least with respect to the interest transferred in Arbor's timberland, that a small second stage discount is appropriate, albeit a much smaller one than advocated by petitioners. We have pointed out above the deficiencies in the valuation approaches taken by the parties' experts. Because we do not fully accept the views of any one of the experts, we have necessarily had to rely on our own best judgment, reflected in our ultimate findings, concerning the bargain which would be struck by the hypothetical buyer and seller of the Arbor stock. In summary, we arrived at the value of Arbor's investment interests in the seven corporations, set forth in our Ultimate Findings of Fact, as follows: For MHC, we adopted, to a major extent, respondent's approach. We capitalized MHC's adjusted operating profit by 13 percent; added the value of MHC's LPC stock; and divided the sum of the two amounts by the total number of MHC's outstanding shares for a nondiscounted per-share value. [20]
*246 As for ROM, MTC, Verneco, and MDC, we determined for each a weighted average of earnings per share, capitalizing it, consistent with Vaughn's views, by a price/earnings multiple of 5; we then divided the nondiscounted net asset values of each corporation, set forth in our findings, by the respective number of outstanding common shares to arrive at a nondiscounted net asset value per share of each by assigning a weight of one to earnings and a weight of 2 to net assets. [21]
For Martin Park and Teche, we divided the book values of each set forth in our findings by the number of outstanding shares to arrive at a nondiscounted per-share value. To the nondiscounted per-share values for all seven corporations, we applied a 70-percent *247 discount, recommended by Desmond, to reflect the marketability/minority considerations in the hands of Arbor. Having determined the discounted per-share values of each of the seven corporations, we multiplied these values by the respective number of shares of each corporation held by Arbor. In reaching the final per-share values for the gifted Arbor shares, we determined that Arbor's earnings should be accorded some consideration. Although it is true that Arbor is a holding company and the value of its assets is the more significant measure of its value, we think its earnings would be of some consideration to a hypothetical buyer in view of the fact that Arbor's liquidation and the liquidation of its underlying assets are unlikely. Accordingly, we took a weighted average of Arbor's earnings per common share, capitalizing it, as recommended by Vaughan, by a price/earnings multiple of 5. We then took the common stock equity value of Arbor set forth in our ultimate findings and divided it by the number of outstanding Arbor common shares to arrive at a per-share equity value. We assigned a weight of one to earnings and a weight of 3 to equity value to arrive at a nondiscounted value *248 per-share. Finally, we applied a 5-percent discount to reflect the minority interest in Arbor's timberland. Our conclusion has been reached on the basis of weighing all the facts and circumstances revealed by the entire record, recognizing that fair market value is not susceptible to determination by mathematical formula, but is more properly arrived at through the imprecise method of bargaining and negotiation. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Although respondent did not determine a deficiency in gift taxes with respect to the 1978 gifts, the value of the gifts is relevant to the determination of the amount of unified credit available in later years.↩
2. As of each of the dates set forth below, the quoted price of LPC stock was as follows: ↩
Date
Quoted Price
1/31/79
$20.75 7/05/79
20.125
8/13/79
22.25 4/25/80
21.625
7/31/80
27.25 1. Gift splitting was elected by petitioners so that one-half (1/2) is attributable each to Roy O. Martin, Jr. and to Barbara Martin.↩
3. SEC. 2512. VALUATION OF GIFTS. (a) If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift.↩
4. Sec. 25,2512-2(f), Gift Tax Regs., further provides: [T]he weight to be accorded such comparisons [of similar businesses] or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * *↩
5. Vaughn explains his use of a price/earnings multiple of 5 as follows: The price/earnings multiple of five (capitalization rate of .20) is based primarily upon market data maintained by our Engineering and Valuation group in New York, the interest rates available to investors in 1978 and 1979 (the prime rate at the end of 1979 was 15.25 percent), the inherent risk in businesses dependent upon the housing/construction industry, and the P/E ratios of public companies in the general lumber industry (averaging from 6 to 8 during 1978 and 1979: Wickes, Diamond International, Wolohan Lumber, Evans Products, Louisiana - Pacific, etc.)↩
6. Vaughn valued the preferred stock of both ROM and MTC at $30 per share as of Dec. 31, 1979. His valuation was based on the assumption that an investor would expect a 12-percent return on his investment. He does not explain, however, how he determined that a 12-percent yield would be appropriate.↩
7. As stated above, the parties stipulated at the trial that the preferred stock had a value of $5 per share.↩
8. Vaughn's report includes his calculations of Arbor's investment interests and net asset value only as of Dec. 31, 1979, even though gifts were made in 1978 and 1980 as well as 1979. In his report, he makes the following statements concerning the 1978 and 1980 gifts: The same valuation methodology as used to determine the December 31, 1979 values is used to determine fair market value at the 1978 and 1979 gift dates. * * * The value of the Arbor stock gifted on these dates [4/25/80 and 7/31/80] is the value as determined with reference to the December 31, 1979 financial information presented in this report. A prospective purchaser would rely on that information in considering a purchase of Arbor, Inc. stock in April or July of 1980.↩
9. Humes' report states as follows: For the purpose of this valuation, we have used the December 31, 1979 adjusted balance sheet for our analysis since the same calculations and judgments would produce nearly identical valuations for 1978 and 1980. * * *↩
10. Desmond's report describes the adjusted operating profit technique as follows: Adjusted Operating Profit
In this valuation technique, the company's adjusted operating profit (profit before depreciation and amortization, interest, state and federal income taxes, as well as other nonoperating income and expense items) is capitalized at an overall rate which represents expected return on and of its investment. This rate is derived from comparisons with publicly-traded companies which are considered reasonably comparable to the firm being valued. To derive an equity value, the company's interest-bearing debt is deducted from the total capitalized value. Desmond explains his reasons for using this valuation technique for MHC as follows: In the valuation of Industries/MHC, we considered two earnings approaches: price/earnings ratio and adjusted operating profit capitalization. However, this valuation, the price earnings ratio is not indicative because of the substantial amount of nonoperating and nonrecurring income. In an effort to arrive at the best indication of value for the operations of Industries/MHC, the adjusted operating profit capitalization technique was utilized. ↩
11. Desmond arrived at the capitalization rate of 13 percent by the following process: [I]t is determined that the appropriate capitalization rate for Industries/MHC is 20 percent. However, this rate is derived from publicly-traded [comparable] companies whose shares are traded on a noncontrolling fractional basis. In order to reach a 100 percent equity interest in Industries/MHC, a 35 percent control premium (as reflected by the prices paid in tender offers for a controlling interest in publicly-traded companies) is applied to the market-derived capitalization rate, resulting in an adjusted capitalization rate of 13 percent. * * * [Fn. ref. omitted.]↩
12. Desmond's report contains a summary schedule for each of the seven corporations which breaks down revenues received, on a percentage basis, into those received from operations versus those received from other nonoperational sources. For each of the four corporations, i.e., ROM, MTC, Verneco, and MDC, determined by Desmond to be investment companies, the schedules contained in his report show negligible, often negative, percentages of profits from operations. At trial, petitioners presented financial statements from ROM, MTC, and Verneco, included in our findings, showing significant percentages of operating income for each corporation. Apparently, the discrepancy lies in the respective sources of financial information relied on by Desmond and petitioners to determine operating income. Desmond's assistant, William Mastoris (Mastoris), who prepared the schedules, used only the tax returns of the four corporations. Because sec. 631 provides special capital gain treatment, under certain conditions, to income from timber operations, the income from the timber operations of each of the four corporations is reflected on the tax return as capital gain. When preparing the schedules, Mastoris classified capital gain income as nonoperating income and failed to take into account, or make an adjustment for, the sec. 631 income of the four corporations. Petitioner's analysis of operating versus nonoperating income is derived from financial statements which would not have been adjusted for the special tax treatment afforded by sec. 631. Thus, the financial statements used by petitioner reflect income from the corporations' timber activities as operating income. When this discrepancy was pointed out to Desmond at trial, he stated that even though, based on the financial statements, the percentages of operating income of the corporations were significantly higher, such fact did not alter his conclusion that each of the four corporations should be valued as investment companies, because the value of their assets, consisting of vast timber holdings, so far exceeded their annual income from whatever sources. ↩
13. For ROM and MTC, Desmond also subtracted from their net asset values the value of their preferred shares. Like Vaughn, Desmond valued the preferred shares of ROM and MTC based on expected yield. Desmond obtained an appropriate yield rate using Moody's Industrial Manual to determine the yields of preferred issues traded in the market at or around each valuation date. To the market yields he added a 35-percent minority interest discount to arrive at an overall adjusted market yield. The following schedule, taken from Desmond's report, reflects the yield rates used and the values reached for the ROM and MTC preferred shares: ↩
Value at
Value at
Value at
Value at
Value at
Value at
1/25/78
1/31/79
7/ 5/79
8/13/79
4/25/80
7/31/80
Market Yield -
Medium Grade
Industrials
7.56%
8.66%
9.02%
8.87%
10.65%
10.08%
(+) 35% Minority
Interest Discount
2.65 3.03 3.16 3.10 3.73 3.53 Adjusted Market
Yield (Rounded)
10.21%
11.69%
12.18%
11.97%
14.38%
$13.61%
Roy O. Martin
Lumber
Co. Non-Voting
Preferred Stock
Dividend
$ 4.00 $ 4.00 $ 4.00 $ 4.00 $ 4.00 $ 4.00 Adjusted Market
Yield
10.21%
11.69%
12.18%
11.97%
14.38%
13.61%
Indicated Value
(Rounded)
$39.00 $34.00 $33.00 $33.00 $28.00 $29.00 Martin Timber
Co.,
Inc., Non-Voting
Preferred Stock
Dividend
$ 4.00 $ 4.00 $ 4.00 $ 4.00 $ 4.00 $ 4.00 Adjusted Market
Yield
10.21%
11.69%
12.18%
11.97 14.38 13.61 Indicated Value
(Rounded)
$39.00 $34.00 $33.00 $33.00 $28.00 $29.00 14. Desmond does not include the 35-percent marketability discount in his report. At trial, he explained that he did not include it because it was his impression that a marketability discount had been built into the stipulated fair market values of the respective timberlands held by each corporation. At trial, the parties agreed that no such discount was built into the stipulated values of the timberland. Thus, Desmond agreed that a 35-percent marketability discount would be appropriate for ROM, MTC, Verneco, and MDC.↩
15. Notwithstanding the value of $19.17 for all gift dates determined by Humes, one of their experts, petitioners request the Court on brief, without explanation as to their reasons for doing so, to find the fair market values of Arbor stock as determined by Vaughn in his report.↩
16. As indicated above in our description of their respective approaches, Vaughn and Desmond used a somewhat different method of valuing MHC. Vaughn capitalized a weighted average of MHC's earnings per share by a price/earnings multiple of 5; he then determined MHC's net asset value per share, including the value of MHC's LPC stock; he arrived at a final per-share value by assigning equal weight to earnings and net asset value. Desmond capitalized MHC's adjusted operating profit by 13 percent and added the value of MHC's LPC stock. After applying discounts (Vaughn: 50 percent; Desmond: from 56 to 70 percent), both reached fairly close conclusions as to the per-share value of MHC stock as set forth below: ↩
Vaughn:
as of
12/31/79
$ 7.14
Desmond:
as of
1/25/78
$ 8.09
1/31/79
$ 7.65
7/ 5/79
$ 9.26
8/13/79
$ 9.87
4/25/80
$ 8.54
7/31/80
$10.47
17. Rev. Rul. 59-60, 1959-1 C.B. 237, which outlines methods for valuing the stock of closely held corporations provides as follows (1959-1 C.B. at 242): Sec. 5. Weight To Be Accorded Various Factors. The valuation of closely held corporate stock entails the consideration of all relevant factors * * *. Depending upon the circumstances in each case, certain factors may carry more weight than others because of the nature of the company's business. To illustrate: (a) Earnings may be the most important criterion of value in some cases whereas asset value will receive primary consideration in others. In general, the appraiser will accord primary consideration to earnings when valuing stocks of companies which sell products or services to the public; conversely, in the investment or holding type of company, the appraiser may accord the greatest weight to the assets underlying the security to be valued.↩
18. For MHC, Desmond applied marketability/minority discounts ranging from 56 to 70 percent on the several valuation dates.↩
19. Estate of O'Connell v. Commissioner,T.C. Memo. 1978-191, affd. in part and revd. in part 640 F.2d 349 (9th Cir. 1981); Gallun v. Commissioner,T.C. Memo. 1974-284; Estate of Thalheimer v. Commissioner,T.C. Memo. 1974-203, remanded per curiam 532 F.2d 751↩ (4th Cir. 1976).
20. We have adopted respondent's approach as more accurate than petitioners' because, as explained by Desmond in his report, the capitalization of adjusted operating profit reflects MHC's value more clearly than does the price/earnings approach of petitioners', given the amount of MHC's nonoperating and nonrecurring income. In addition, respondent's expert gives financial information and calculations for all gift dates at issue, whereas petitioners' expert provides information only as of Dec. 31, 1979.↩
21. For ROM and MTC, we subtracted from their respective net asset values the value of their preferred shares as determined by respondent's expert. We accept Desmond's valuation of the preferred shares of these corporations because he valued the shares for each of the gift dates at issue using yield rates determined individually for each date. Petitioner's expert provided a valuation for the preferred shares of ROM and MTC only as of Dec. 31, 1979.↩